FILED

2018 APR 23 AM 10: 00

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INFORMATION** |
| Plaintiff, | ) ) | 5:18 CR 193 |
| v. | ) ) | CASE NO. _____ |
| JULIO PINO, | ) ) | Title 18, Section 1001, United States Code |
| Defendant. | ) ) | |

JUDGE GAUGHAN

## GENERAL ALLEGATIONS

At all times relevant to this Information:

1. Defendant JULIO PINO was a resident of Kent, Ohio, in the Northern District of Ohio, Eastern Division. From in or around 1992 through on or about the date of this Information, Defendant was employed as a professor at Kent State University ("KSU"), located in Kent, Ohio.

2. J.E. was a resident of St. Louis, Missouri.

3. Defendant and J.E. were "friends" on Facebook, which allowed them to review each other's individual posts and Facebook walls, and communicate in a peer-to-peer exchange viewable to only them. J.E.'s Facebook username matched J.E.'s name.

4. The Federal Bureau of Investigation ("FBI") was a part of the executive branch of the United States government.

5. Beginning at least as early as on or about February 6, 2010, Defendant maintained online social media accounts with two social media websites (collectively, the "Social Media Accounts"). From at least in or around May 2015, through in or around January 2016, Defendant posted numerous statements and images on the Social Media Accounts concerning, among other topics, conversations he had with J.E. and discussions with J.E. about J.E.'s child custody issues. Among these conversations, on or about September 11, 2015, Defendant and J.E. had the following communications:

    a. J.E. wrote, "I'm playing the game backwards. and winning! . . . I will kill 100s of people if they take my rights as a father away!"

    b. Defendant stated, "Yes, in military terms this is known as 'the Parthian shot'."

    c. J.E. wrote, "hell, 10000's! . . . It';s [sic] time for Men to act like men again. . . . See the thing I've got on my side is God. That allows me certain rights. One of those rights is to strike down evil with furious vengeance! . . . People don't even know how crazy I am yet! That's because no ones ever tried to take my [relative]. They're about to meet to [the] Monster they've created."

    d. Defendant stated, "Devour them, [J.E.]."

    e. J.E. wrote, "Thank You! I will! :)"

6. From in or around December 2015 through in or around January 2016, J.E. wrote on his Facebook wall a series of threatening communications directed against a St. Louis Family Court Judge adjudicating J.E.'s child custody case. On or about January 11, 2016, J.E. also wrote on his own Facebook wall, "I f***ing love Julio Pino, even if he does eventually do

2

something that most consider horrible, I'll still love him because I know him in a deeper way than most of you even could."

7. On or about January 11, 2016, law enforcement authorities in St. Louis arrested J.E. for making threatening communications against the Family Court Judge. The FBI was involved in investigating J.E.'s threats against the Family Court Judge.

8. On or about January 18, 2016, Special Agents with the FBI, Cleveland Division, interviewed Defendant in Miami, Florida, about his posts and comments on the Social Media Accounts concerning his interactions with J.E. and discussions with J.E. about J.E.'s child custody issues. The FBI Special Agents recorded this interview in connection with an ongoing FBI, Cleveland Division, and Grand Jury for the Northern District of Ohio investigation concerning, among other things, Defendant's interactions with J.E. as described in the preceding paragraphs. During the course of that investigation, federal grand jury subpoenas from the Northern District of Ohio were issued. In response to questions from FBI Special Agents concerning whether he ever had conversations with J.E. on the Social Media Accounts, Defendant, knowing full well the content of his Social Media Account interactions with J.E., stated he "never heard of [J.E. or] maybe I heard of him through the news," he did not recall conversations with J.E. and that his conversations with J.E. were "invented conversation[s]." When asked again if he remembered the conversation with J.E., Defendant responded, "I never heard of him, well maybe I heard of him through the news," and then later stated, "the other way around it is certainly possible that he could have heard of me and made up this conversation, invented it."

## STATUTORY VIOLATION

### COUNT 1
(False Statement to Law Enforcement, 18 U.S.C. § 1001)

The United States Attorney charges:

9. The factual allegations contained in Paragraphs 1 through 8, including all sub-paragraphs, of the General Allegations of this Information are re-alleged and incorporated as though fully set forth herein.

10. On or about January 18, 2016, in the Southern District of Florida and in a matter affecting the Northern District of Ohio, Eastern Division, and elsewhere, Defendant JULIO PINO knowingly and willfully made material false, fictitious and fraudulent statements to a Special Agent of the FBI in a matter within the jurisdiction of the executive branch of the government of the United States, that is, Defendant stated that he "never heard of [J.E. or] maybe I heard of him through the news," that he did not recall conversations with J.E., that his previous conversations with J.E. were "invented conversation[s]," "I never heard of him, well maybe I heard of him through the news," and that "the other way around it is certainly possible that he could have heard of me and made up this conversation, invented it," when in truth and fact, as Defendant then well knew, those statements to the FBI Special Agent were false, all in violation of Title 18, United States Code, Section 1001.

By: _____
JUSTIN E. HERDMAN
United States Attorney

4